[No. 1811.]

## JAMES P. WRIGHT v. THE STATE.

1. PRACTICE — AUTREFOIS ACQUIT AND CONVICT. — *Autrefois acquit* is only available in cases where the transaction is the same, and the two indictments are susceptible of, and must be sustained by, the same proof. *Autrefois convict* only requires that the transaction or the facts constituting it be the same. See the opinion *in extenso* for the distinction between the two defenses illustrated and elaborated.

2. SAME — THEFT. — When the evidence shows that the theft of cattle of two different owners was perpetrated in a single transaction, the conviction of the accused of the theft of the cattle of one of the said owners will, upon the doctrine of *autrefois convict*, and the doctrine of carving, operate to bar a prosecution for the theft of the cattle of the other owner. But, being charged in an indictment with theft of the cattle of one of the owners, and tried upon that indictment and acquitted, the plea of *autrefois acquit* is not available in a prosecution upon another indictment charging the theft of the cattle of the other owner, notwithstanding the transaction be the same, and the evidence identical; for, while such evidence might have been insufficient in the first instance, it might well be all-sufficient in the last instance. See the opinion on the question.

3. SAME. — The stealing of different articles of property belonging to different persons at the same time and place, so that the transaction is the same, is but one offense against the State. The accused cannot be convicted on separate indictments charging different parts of one transaction as distinct offenses. A conviction on one of the indictments bars a prosecution on the others, because the State can carve but once.

4. SAME — JURY LAW — NEW TRIAL. — A motion for new trial, supported by affidavits, alleged misconduct of the jury as follows: 1. One of the jurors was permitted by the officer having the jury in charge to separate from the jury and go, unaccompanied by an officer, to the suburbs of the town after his bed clothing, and was for some time out of the sight of the jury and the officer. 2. Whilst the jury had the case under advisement, and were being kept in the court room for the night, the officer in charge of the jury permitted the officers of the town council of Gonzales to come into the court room where the jury were, and permitted the foreman of the jury, who was a member of the town council, to attend and participate in the transaction of the business before the town council in the presence of the jury. 3. Whilst the jury had the case under advisement (they slept in the court room), the officer in charge permitted one B., who was not a member of the jury, nor an officer of the court, to sleep all night in said court room with one of the jurors. *Held,* that, under articles 687, 689 and 690 of the Code of Criminal Procedure of this State, a conviction had under the circumstances shown cannot be permitted to stand.

APPEAL from the District Court of Gonzales. Tried below before the Hon. E. Lewis.

The indictment charged the appellant and two others, E. S. Alley and Benjamin Lemmond, with the theft of fifteen head of neat cat-

tle, the property of R. H. Floyd, in Gonzales county, Texas, on the 10th day of January, 1880. A severance being granted, the defendant Wright was first put upon trial, was convicted, and his punishment assessed at a term of three years in the penitentiary.

R. H. Floyd was the first witness for the State. He testified that he lived in Gonzales county, Texas, eleven miles southwest from the town of Gonzales, and four miles 'from Wrightsboro. His ranche was in Gonzales county. He had cattle ranging in the counties of Gonzales, Wilson, Karnes, Victoria, Goliad and De Witt. The larger number ranged in Gonzales county. From the witness's place to the Wilson county line the distance is some sixteen miles; to the Karnes county line about twenty miles, and about the same distance to the De Witt county line. Just prior to January, 1880, the witness lost quite a number of head of cattle. They were taken from their range without the consent of the witness. H. C. Evans paid the witness for ten or fifteen head about March, 1880. Witness did not see those cattle. The defendant was familiar with the brands of the witness. He marked cattle with the witness for eight or ten years prior to 1878. Mr. Granger was not the agent of the witness in Gonzales county, and at no time paid witness for the cattle involved in this prosecution, though he paid witness for others which he, as the witness's agent in Wilson county, had previously sold. Witness's power of attorney to Granger authorized him to handle witness's cattle as his own. The power of attorney to Granger did not limit him as to territory, but it was understood that Granger was only to control the witness's cattle within Granger's own range. Witness may possibly have had some cattle in Atascosa county, but he never sent his cattle out west by Granger or any one else. Witness had seen cattle in the 20 brand in De Witt county which he did not own. Fred House, Lawrence Brass and Alex. Grayer had authority to control the witness's cattle. The power of attorney conferring this authority has never been revoked. Witness could not say that he had ever seen the cattle the defendant is charged to have stolen.

The State here introduced the record of marks and brands, and the records of transfers of stock in several brands, including one from W. H. Seat by G. W. L. Fly, agent, which among others conveyed to Floyd the 20 brand.

G. W. L. Fly testified, for the State, that W. H. Seat was his brother-in-law, and that he, witness, had absolute control of all property owned by Seat in Texas. His power of attorney, at the time he executed the bill of sale to Floyd, conveying the "20"

brand of cattle, only authorized him to sell lands. Seat at that time was either in Europe or New York.

H. C. Evans testified, for the State, that in March, 1880, R. H. Floyd and R. A. Houston gave him a power of attorney to go west and recover cattle for them. On his way to the Laborita Creek in Atascosa county, witness got with John Sullivan, Drake, and John Brockman. Arriving at the Black Hills ranche, four miles from Bennett Musgrave's ranche, witness found a bunch of cattle in the possession of J. F. Foster, and from this bunch recovered fifteen head of Floyd's cattle,— seven in the JOE. A brand, three in the IB — cross brand, and one or two in the 20 brand.

Witness was here handed a bill of sale from himself, Brockman, Sullivan and Drake to B. R. Fakes & Co., and asked to refresh his memory as to the brands he cut out of the herd. He testified that he sold the cattle mentioned in the bill of sale, with others, to Bennett Musgrave for B. R. Fakes & Co. Those cattle had their original brands counter-branded, and these counter-brands were not over two or three months old. They were likewise fresh branded in characters impossible to delineate in type. The cattle described were found in a herd of four or five hundred head. Witness could have made nearly all, if not all, of the brands without reference to the bill of sale he executed. The IB brand was on the sides of the animals and the cross on the hips. The original brands were in no way disfigured. Witness did not know which of the fresh brands mentioned by him was on Floyd's cattle. Witness at no time saw the defendant in possession of the cattle. Witness and his party were drinking considerably when he first found the cattle. Witness testified in case number 2172, *The State of Texas* v. *J. P. Wright and Simpson Alley*. Witness got the Houston and Floyd cattle at the same time and place. Witness's testimony in this case and in case 2172 is substantially the same. He did not mention Floyd's name when testifying in case 2172.

Bennett Musgrave testified, for the State, that he lived in Atascosa county, Texas. He knew the defendant and Alley, Lemmond, Evans and Foster. In March, 1880, Evans took several head of cattle which Foster bought of the defendant from Foster's herd, and, as agent for Floyd and Houston, sold the same cattle to the witness for B. R. Fakes & Co. These same identical cattle were sold to Foster, with bill of sale, by the defendant, at the witness's house, and in the presence of the witness, and the defendant received from Foster the purchase money for the same. Witness wrote the bill of sale, and the defendant wrote his own name and

the names of Alley and Lemmond, as agent. Witness first saw these cattle, while on a horse hunt, in a bunch through which he rode. Defendant then offered to sell them to the witness. Charles Walker was then present. Witness next saw these cattle when he went to the Black Hills ranche to assist Foster receive them. Foster came from Massachusetts, and knew nothing about classifying cattle. Foster kept the cattle on the range until they were claimed by Evans. Some little time after that, defendant came to witness's house, and witness, who then had the cattle in possession, showed him Evans's bill of sale to him as agent of Fakes & Co. Defendant said that he had bought the cattle from Bill Williams, and had a bill of sale. He said that he herded the cattle at his father's house, near Wrightsboro, in Gonzales county, and asked: "Why didn't these d——d rascals claim them there?"

The witness wrote the bill of sale from the defendant to Foster, after which he handed the document to Foster and advised him to have it recorded in Atascosa county. Whether or not he ever had it so recorded the witness did not know. The witness was too hurried to examine the brands when he first saw the cattle. At that time the defendant said that he was negotiating the sale of the same cattle to a man named Dorsey. Upon the sale to Foster it was agreed that the defendant was to get the cattle together and hold them until Foster called for them. After the witness purchased the stock for Fakes & Co., some four or five head were proved away by other parties. This witness testified in case number 2172, *The State of Texas* v. *J. P. Wright and Simpson Alley*, for the theft of Houston's cattle. The recovery of the cattle, and all the incidents preceding, so far as witness knew, was a single transaction, and the testimony of the witness in the two cases was substantially the same. When the witness first saw the cattle in charge of the defendant, the defendant claimed all the brands as his. The marks on the cattle had evidently been changed about the time the several fresh brands were put on. When witness told the defendant that Evans, Brockman, Sullivan and Drake had sold the cattle to Fakes & Co., the defendant said that they had no right to make such sale. This conversation came about in a discussion with regard to the defendant's title to a white steer which Evans had sold to Fakes & Co. as branded T 8. The defendant said that the brand was not T 8, but was T B. When the steer shed his long hair, the defendant proved to be right about this brand. This steer defendant claimed to have purchased from Jeffries in Gonzales county.

Charles Walker testified, for the State, that, on November 9, 1879, he was employed by the defendant to drive some cattle from Nance's pasture in Hays county to Laborita in Atascosa county. These cattle were fresh branded in the characters spoken of by other witnesses, and were claimed in part by the defendant, his wife and daughter, in part (another brand) by Lemmond, and in part (still another brand) by W. A. Anderson, the defendant's brother-in-law. At the Conquista, some forty or fifty head in still another brand were put in the herd by Lemmond and Alley as theirs and the defendant's partnership property. Alley and Lemmond turned back at the Conquista, and the defendant and the witness proceeded to Laborita with the cattle, arriving there on December 20 or 21, 1879. Witness remained with the cattle at Laborita until February 9, 1880. Defendant stayed but a day or two at Laborita, when he started home. He returned in about ten days with Alley and Lemmond, and one of the three, in the presence of the other two, told the witness that he had put more cattle in the herd. Witness was present when the defendant offered to sell the cattle to Musgrave. Witness noticed some familiar brands in the herd, spoke to defendant about them, and advised him to move the cattle further west. He replied that the cattle belonged to him; that he had bought them from Bill Williams, "out east." Witness knew the brands of Houston and Floyd. He could not, however, remember that any of these cattle were in Floyd's brand, and in fact could remember no more than that the brands were familiar to him. Witness had testified about this herd of cattle before, but said nothing about Floyd's cattle.

The cattle in the familiar brands spoken of, the witness was sure, were not in the herd taken from Major Nance's pasture in Hays county, by the witness and the defendant. These cattle were driven to Atascosa county along the public road in the day-time, and the public road was never abandoned except to graze and water. The cattle were driven through the edge of the town of Seguin, and across the river at the ford. The defendant took horses east and traded them for cattle. All the cattle brought to the Conquista and put into the herd by Lemmond and Alley were eastern cattle. The Conquista is about fifty miles from Wrightsboro, and the point on the Laborita to which the herd, about three hundred head, were taken, was about one hundred miles from Gonzales county. The town of Seguin, in Guadalupe county, was the nearest approach to Gonzales county made by the witness and defendant in driving the cattle to Atascosa county. The witness saw no cattle added to the

herd after it was turned loose in Atascosa county. Defendant drove the cattle mentioned from Gonzales county to Nance's pasture. Witness saw no cattle in the herd in Floyd's brands, and, though it was possible that the herd may have contained some and witness not known it, it was hardly probable.

John Dorsey testified, for the State, that in February, 1880, he saw the defendant and Alley, Lemmond, Walker and a negro in Atascosa county in charge of a herd of three or four hundred head of cattle. The cattle were fresh branded in the brands described by previous witnesses. The defendant talked freely with witness about the cattle, and always said that they came from Gonzales county near Wrightsboro. He, defendant, said that he wanted to trade two year old heifers for saddle ponies.

A number of persons had cattle in the same range in Atascosa county in which the defendant kept these cattle under loose herd. Witness and defendant often rounded up these cattle for persons stock hunting. The defendant herded his cattle on a purely public place, which was crossed by two public roads, and where the grass was better than elsewhere. It was no place in which to attempt to conceal cattle. There were many other places in Atascosa county in which cattle could have been securely hidden. Witness noticed no difference in the size of the defendant's herd from first to last. Witness knew of no one other than the defendant who claimed the fresh brands referred to.

J. L. Floyd testified, for the State, that he and R. H. Floyd were brothers and partners. Witness gave no one his consent to take the cattle involved in this proceeding. He executed no powers of attorney to any one. R. H. Floyd was the general manager of the firm's business, and executed all powers of attorney.

R. H. Floyd, recalled, testified that he bought the cattle in the JOE. A brand from J. M. McCoy, and received from McCoy a bill of sale, which has been lost. McCoy had previously sold many cattle in that brand. Witness knew a Bill Williams who lived near Rancho, Texas. Williams was never an agent of the witness, unless he was so appointed by some one of witness's authorized agents under their power of substitution.

The defense here put in evidence the indictment and verdict of not guilty in case No. 2172, *The State of Texas* v. *J. P. Wright and Simpson Alley.*

The motions for new trial, original and amended, raised the questions discussed in the opinion, and, in addition, assailed the charge of the court, and denounced the verdict as unsupported, either by the law or the evidence.

*Fly & Davidson*, for the appellant, filed an able brief.

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge. On the trial (the number of this case upon the court docket being 2170) appellant pleaded a former trial and acquittal in cause No. 2172 on said docket. In this case, No. 2170, appellant was indicted for the theft of fifteen head of neat cattle, the property of one R. H. Floyd. In cause No. 2172, in which he had been acquitted, he had been charged with the theft of cattle, the property of R. A. Houston. It is insisted that the evidence shows that the taking of the animals mentioned in the two indictments was one and the same transaction, and that the plea was therefore good and should have been sustained; and we are cited to *Simco's* case, 9 Texas Ct. App., 338, as supporting the position.

Counsel misapprehend the Simco case. An attempt was made by us in that very case to draw the distinction between pleas of *autrefois acquit* and *autrefois convict*. It was said, "*autrefois acquit* is only available in cases where the transaction is the same and the two indictments are susceptible of and must be sustained by the same proof. *Autrefois convict* only requires that the transaction, or the facts constituting it, be the same. To illustrate: If a party be indicted separately for the theft of three horses, the property of A., B. and C., taken at the same time or in one transaction, and he be tried on the first for the theft of A.'s horse, . . . and should be acquitted, would the plea of that acquittal operate a bar to the conviction on the other trials because the transaction was one and the same? By no means. Why? Simply because the proof necessary to a conviction in the latter cases would not convict in the former."

To make it plainer, if possible: In the case before us, the proof necessary to convict for stealing Floyd's cattle was not necessary or essential to be proven on the trial for the theft of Houston's cattle. True, the evidence in both cases might be the same identically, but still it was not necessary to a conviction in the former case that the State should prove that Floyd's cattle were stolen, though the introduction of such evidence might have been unavoidable from the fact that it was inseparable from the evidence connected with the theft of Houston's cattle, which was the issue on trial. In other words, whilst the State was trying him for the theft of Houston's cattle, she was not bound to show the theft of Floyd's cattle, nor was she bound to establish anything more than the theft of Hous-

ton's cattle; and the fact that the evidence necessarily showed more than was charged, viz.: two thefts instead of one, would not be binding upon the State if he was acquitted of the one, because he could not in the one of which he was acquitted have been convicted of the other,— the indictment not charging the latter. An accused cannot be acquitted of a crime with which he has not been charged and tried, and could not be convicted, and in cause No. 2172 the defendant was not charged with a theft of Floyd's cattle.

But suppose defendant had been convicted in the first case for the theft of Houston's cattle, then, on the second, for the theft of Floyd's cattle, he could plead the former conviction, and if the evidence showed that the transaction was but a single one — that is, that the cattle of Houston and Floyd were taken at the same time and place — his plea would be good and should prevail, because the transaction being but one, the prosecution could carve but once, and having once carved and convicted it could not claim another and second conviction against the same party for the single offense. It is the doctrine of carving, a well established principle of criminal law, which makes this distinction between the pleas of *autrefois acquit* and *autrefois convict* where several ostensible crimes are covered by a single transaction. But for this doctrine of carving, his plea of former conviction would not be maintainable in law. (*Simco* v. *The State*, 9 Texas Ct. App., 358.) He had never been acquitted in the former trial of the theft of Floyd's cattle, and could not have been, because he was not charged in the first indictment with their theft, and a defendant cannot be convicted of a crime with which he is not charged. The *allegata* and *probata* must correspond. (*Morgan* v. *The State*, 34 Texas, 677.) But, had he been convicted, he might well say in the second trial, "I have already been convicted for this same transaction, and I cannot be convicted a second time," and had he shown in support of the plea that Floyd's cattle were taken at the same time and place with Houston's, though he was not charged in the first indictment with the theft of Floyd's cattle, his plea would be good and should be sustained as to the latter, because the State had carved already and obtained his conviction for the same offense, and in law that is a satisfaction of the entire offense so far as he is concerned.

In *Wilson* v. *The State*, 45 Texas, 76, it was held that "the stealing of different articles of property belonging to different persons at the same time and place, so that the transaction is the same, is but one offense against the State. The accused cannot be convicted on separate indictments charging different parts of one transaction,

as in each a distinct offense. A conviction on one of the indict-ments bars a prosecution on the others."

The misconduct of the jury after the cause was submitted to them is one of the grounds urged in the motion for a new trial. Affida-vits in support of this ground of the motion show: 1. That one of the jurors was permitted by the officer having the jury in charge to separate from the jury and go, unaccompanied by an officer, to the suburbs of the town, after his bed clothing, and was for some time out of sight of the jury and the officer. 2. That whilst the jury had the case under advisement and were being kept in the court room for the night, the officer in charge of the jury permitted the officers of the town council of Gonzales to come into the court room where the jury were, and permitted Green De Witt, who was foreman of the jury and also a member of the board of the town council, to attend and participate in the transaction of the business before the town council, in the presence of the jury. 3. Whilst the jury had the case under advisement, they slept in the court room. The offi-cer in charge permitted one John Barnett, who was not a member of the jury or even an officer of the court, to sleep all night in said court room with one of the jurors.

In *Jones* v. *The State*, 68 Mich., 760, "where a sheriff in charge of a jury occupied the bed with them during their deliberations upon a criminal case, it was held that, though a grave irregularity, yet a verdict would not be set aside where it was apparent that no harm resulted."

In *Comm.* v. *Wormley*, 8 Gratt. (Va.), 712, "A sheriff to whom a jury is committed in the progress of a criminal trial walks with them to a neighboring house, and whilst there withdraws from the room where they are, leaving them in the company of three other persons. Although these other persons swear that there was no allusion by them to the trial during such absence of the sheriff, yet the verdict of the jury against the prisoner is to be set aside and a new trial directed."

Our statutes upon the subject are too plain and emphatic to be misunderstood. They say: "After the jury has been sworn and impaneled to try any case of felony, they shall not be permitted to separate until they have returned a verdict, unless by permission of the court with the consent of the attorneys representing the State and the defendant, and in charge of an officer." (Code Crim. Proc., art. 687.) "It is the duty of the sheriff to provide a suitable room for the deliberation of the jury in all criminal cases, and to supply them with such necessary food and lodging as he can obtain; but

no spirituous, vinous, or malt liquors of any kind shall be furnished them." (*Id.*, art. 689.) "No person shall be permitted to be with the jury while they are deliberating upon a case, nor shall any person be permitted to converse with a juror after he has been impaneled except in the presence and by the permission of the court, . . . and in no case shall any person be permitted to converse with the juror about the case on trial." (*Id.*, art. 690.)

The conduct both of the officer in charge and the jury, as set out above, is a most gross and palpable violation of the letter as well as spirit of our statute, and (as was said in *Warner* v. *The State*, 9 Texas Ct. App., 620) should not be tolerated in grave cases affecting the life or liberty of the citizen, when not only the defendant but the State also demands that the verdict of the jury shall be above suspicion and command full faith and confidence. (*Eurley* v. *The State*, 1 Texas Ct. App., 248.)

In the case of *Daniel* v. *The State*, 56 Ga., 653, Ch. J. Warner says: "Jurors are as liable in our day to be influenced and controlled by public opinion as Pilate was in his day, when by the clamor of the multitude he consented to deliver up our Savior to be crucified. The policy of the law is to protect jurors from all such influences and temptations in the trial of criminal cases, as well as defendants who may be injured thereby." (*S. C.*, 2 Amer. Crim. Repts. (Hawley), 421; *Wood* v. *The State*, 34 Ark., 311; 40 Ala., 454.)

This court cannot sanction a verdict of guilty in a felony case found under such circumstances. We do not deem it necessary to discuss the other errors complained of. They are not likely to arise again.

*Reversed and remanded.*

[Opinion delivered November 15, 1884.]